1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BEATRIZ ALCANTAR, et al.,

                  Plaintiffs,

     v.

CITY OF CENTRALIA,

                  Defendants.

CASE NO. 3:21-cv-05458-DGE

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (DKT.
NO. 31)

## I      INTRODUCTION

This matter comes before the Court on Defendants City of Centralia and Officers

Frederick J. Mercer, Aaron M. Miller, and Ruben Z. Ramirez's Motion for Summary Judgment

(Dkt. No. 31.)

## II      BACKGROUND

On June 18, 2019, Centralia Police Officer Frederick Mercer responded to reports of a

suspected burglary with a man kicking in a door with an axe.  (Dkt. No. 32 at 5.)  The call

described the suspect, later identified as Joshua Flores, as a Black or Hispanic male wearing a

1  white shirt and jeans or black pants, holding an axe.  (*Id.*)  On the way to the scene, dispatch

2  informed Mercer that Flores had broken a window and gained access to a house where a woman

3  was screaming at him to leave because she had a baby inside.  (*Id.* at 7–8.)  Flores then left out

4  the back to a neighbor's house and was attempting to kick in the door, chasing somebody with a

5  pitchfork or some other tool before running down an alley.  (*Id.* at 8.)  Mercer and Officer Aaron

6  Miller arrived at the same time and Miller walked into the alley.  (*Id.* at 9, 61.)  A crowd of

7  people gathered on the east side of the street pointed toward the alley and told Mercer "That's

8  the guy."  (*Id.* at 9.)

9        Mercer noticed Flores in the middle of the street about 100 feet away.  (*Id.* at 11, 13.)

10  Flores was advancing toward two people when Mercer got his attention and instructed him to get

11  on the ground.  (*Id.* at 14.)  Mercer noticed a glint in Flores's left hand, suggesting Flores carried

12  a knife.  (*Id.*)  Flores then proceeded toward Mercer in an abnormal, marching-style gait.  (*Id.* at

13  15.)  Officer Ruben Ramirez arrived at the scene, exited his cruiser, and advised Mercer that

14  Flores wielded a knife.  (*Id.* at 16.)  According to Ramirez, Flores appeared to be experiencing a

15  mental health crisis.  (*Id.* at 53.)  Flores continued to advance toward Mercer while yelling, "Do

16  it, do it," and posturing the blade toward Mercer.  (Dkt. No. 33 at 3.)  When Flores was 10-15

17  feet away, Mercer fired a single round into Flores's chest.  (*Id.*)  Flores then pulled his arms in,

18  turned around, stumbled a couple of steps, and fell forward on the ground onto his stomach.  (*Id.*;

19  Dkt. No. 32 at 56.)

20        Ramirez secured Flores in handcuffs and checked his injuries.  (Dkt. No. 32 at 56.)

21  Miller put a bandage on Flores's wound and turned him face down in the dirt before taking

22  pictures of the scene.  (*Id.* at 67.)  Within a few minutes, an ambulance arrived.  (Dkt. No. 33 at

23  3.)  Flores did not survive the fatal shot.  (*See* Dkt. No. 32 at 96.)

24

1       At the scene, Mercer had in his vehicle a rifle, baton, and pepper spray, and on his person

2   carried a Taser, a knife, and a gun.  (Dkt. No. 35-1 at 19.)  He chose not to deploy the Taser

3   because he "didn't trust [his] Taser in that situation" as Flores "was carrying a knife."  (Dkt. No.

4   35-1 at 5–6).  Ramirez carried a Taser and was accompanied by a K-9 unit he chose not to

5   deploy because Flores was armed with a knife.  (Dkt. No. 35-6 at 32, 38.)  Miller also carried a

6   Taser.  (Dkt. No. 35-7 at 17.)

7       Mercer had encountered Flores before.  Approximately one to two years prior to Flores's

8   death, Mercer responded to a neighbor's complaint after Flores had hopped a fence and was

9   attempting to retrieve a ball from a neighbor's property.  (Dkt. No. 35-1 at 12, 8.)  Flores brought

10  the ball back over to his side of the fence and told Mercer he was "trying to protect his family."

11  (*Id.* at 10.)

12      Mercer's next contact with Flores led him to conclude Flores experienced mental health

13  issues.  (*Id.* at 9.)  On May 16, 2019, Flores called Centralia Police—Mercer and Officer Andrew

14  Huerta—to his grandmother's house because he believed people were entering through the walls

15  and ceiling of the attic.  (Dkt. Nos. 35-1 at 13; 35-2 at 7.)  According to Flores's mother, he

16  destroyed the attic, tried to break the walls, heard voices, and stated people were living in the

17  attic because he saw them in the crawl space.  (Dkt. 35-2 at 7.)  Flores took the officers around

18  the house for 15-20 minutes demonstrating how the people were getting inside.  (Dkt. No. 35-1

19  at 13.)  The officers called the mobile crisis team, and Flores was admitted to the emergency

20  department at Providence Centralia Emergency Center.  (Dkt. Nos. 35-1 at 13; 35-2 at 7.)  Flores

21  reported a history of paranoid schizophrenia for which he discontinued medication, and his

22  medical record revealed a history of methamphetamine use.  (Dkt. No. 35-2 at 12.)  Flores was

23  placed in seclusion, began punching the glass door to his room, was restrained, and then fled the

24

emergency department prior to being seen by the crisis team.  (*Id.* at 6, 12.)  Later the same day, Flores was brought back to the ED involuntarily by law enforcement after being found outside with a knife threatening family and police.  (Dkt. No. 35-2 at 4.)

On June 17, 2019, the day before he died, Flores called 911 and stated someone had drugged him when he was in high school, and he was just now remembering the event.  (Dkt. No. 35-4 at 3.)  Mercer spoke with Flores for approximately 13 minutes on the phone about his concerns.  (*Id.*)

A toxicology report following Flores's death revealed the presence of methamphetamine in his system.  (Dkt. No. 32 at 97.)  According to the report, the blood of methamphetamine abusers who exhibit violent and irrational behavior contained between 200-600 ng/mL of methamphetamine.  (*Id.* at 99.)  Flores's blood contained 910 ng/mL.  (*Id.* at 97.)

Defendants City of Centralia and Officers Mercer, Miller, and Ramirez move for summary judgment.  They argue their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Accordingly, Defendants argue, even viewing the facts in the light most favorable to Plaintiffs, Defendants are entitled to qualified immunity and are precluded from liability.

### III    DISCUSSION

#### A.  Legal Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the

burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial— e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elec. Serv.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 256– 257).  Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–889 (1990).

### B.  Motion to Strike

As an initial matter, Plaintiffs move to strike Defendants' Exhibits 2, 3, 4, 7, 8, and 9 as these documents were not presented in a form that would be admissible in evidence. (Dkt. No. 34 at 27.)  Plaintiffs argue Defendants' declaration is insufficient to authenticate the exhibits.  (*Id.*)

1    A party may object to material cited as factual support within a motion for summary

2    judgment because the material cannot be presented in a form that would be admissible in

3    evidence.  Fed. R. Civ. P. 56(c)(2).  An affidavit or declaration used to support or oppose a

4    motion must be made on personal knowledge, set out facts that would be admissible in evidence,

5    and show the affiant or declarant is competent to testify on the matters stated.  Fed. R. Civ. P.

6    56(c)(4).

7    Exhibits 2, 3, 7, and 8 are documents produced by Plaintiffs.  (Dkt. No. 37 at 1–2.)  Thus,

8    they are deemed authenticated when offered by Defendants.  *See Orr v. Bank of Am., NT & SA*,

9    285 F.3d 764, 777 (9th Cir. 2002); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769,

10   781 (C.D. Cal. 2004) ("PwC produced Exhibit EE during the discovery process; such documents

11   are deemed authentic when offered by a party-opponent.").  Further, Plaintiffs do not assert any

12   reason to doubt these documents' authenticity.  *See Jackson v. Patzkowski*, Case No. C18-1508-

13   RSM-MLP, 2020 WL 13219613, at *12 (W.D. Wash. Jul. 14, 2020) (citing *Maljack Prods., Inc.

14   v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th Cir. 1996)).

15   Exhibit 9 is the report of Officer Chris Nielsen, a police tactics expert retained by

16   Defendants.  (Dkt. No. 32 at 2.)  Plaintiffs argue the report is neither authenticated nor

17   admissible because an expert report cannot be used to prove the existence of facts.  (Dkt. No. 34

18   at 27) (citing *Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1261–1262 (9th Cir. 1984)).

19   Defendants do not offer the report to establish facts about the incident, but rather to establish

20   Washington law applicable to enforcement officers on the appropriate use of lethal force,

21   something upon which Nielson appears qualified to testify.  (Dkt. Nos. 36 at 14; 31 at 13.)  The

22   contents of the report could be presented at trial through expert testimony and can therefore

23   support a motion for summary judgment even if the report itself is not admissible.

24

1      Exhibit 4 is the deposition of Ramirez and is authenticated by Defendants' counsel's

2  declaration. (Dkt. No. 32 at 2.) Defendants argue its contents would be admissible at trial

3  through Ramirez's testimony. (Dkt. No. 36 at 13.) While Defendants' counsel should have

4  included the list of attendees page of Ramirez's deposition to show the declarant attended the

5  deposition, Mr. Justice clearly makes objections throughout the transcript, and no real dispute

6  appears regarding the authenticity of the deposition itself. Striking it would thus elevate form

7  over substance. *See Jeffries v. Las Vegas Metro. Police Dep't*, 713 F. App'x 549, 550–551 (9th

8  Cir. 2017) ("[A] district court's consideration of unauthenticated evidence on a motion for

9  summary judgment constitutes harmless error if a competent witness with personal knowledge

10  could have authenticated the evidence.").

11      This Court therefore **DENIES** Plaintiffs' motion to strike and will consider Exhibits 2, 3,

12  4, 7, 8 and 9 to the extent they are relevant.

13      **C.  Fourteenth Amendment claim against Officer Mercer**

14      Defendants argue Mercer is entitled to qualified immunity on Plaintiffs' § 1983 claim for

15  violating Alcantar's Fourteenth Amendment liberty interest in a familial relationship with her

16  son. (Dkt. No. 31 at 16.) Defendants argue the Fourteenth Amendment is not applicable to

17  Mercer's use of force on Flores because all claims in which law enforcement officers have used

18  excessive force should be analyzed under the Fourth Amendment's "reasonableness" standard

19  rather than substantive due process. (*Id.*) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

20      Alcantar asserts *Graham* does not require parents' and children's due process claims be

21  analyzed under the Fourth Amendment standard. (Dkt. No. 34 at 22.) While the subject of

22  excessive force can only raise a Fourth Amendment claim, this Circuit recognizes the Fourteenth

23  Amendment liberty interest of "a parent who claims loss of the companionship and society of his

24

1    or her child, or vice versa . . . ." *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325

2    (9th Cir. 1991); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

3         Only official conduct that "shocks the conscience" is cognizable as a due process

4    violation. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). To determine whether official

5    conduct "shocks the conscience," courts must first ask whether the circumstances are such that

6    actual deliberation by the officer is practical. *Id.*; *Cnty. of Sacramento v. Lewis*, 523 U.S. 833,

7    851 (1998). Where actual deliberation is practical, an officer's deliberate indifference may

8    suffice to shock the conscience. *Wilkinson*, 610 F.3d at 554; *Porter*, 546 F.3d at 1137. Where a

9    law enforcement officer makes a snap judgment because of an escalating situation, his conduct

10   can only shock the conscience if he "acts with a purpose to harm unrelated to legitimate law

11   enforcement objectives." *Wilkinson*, 610 F.3d at 554; *Porter*, 546 F.3d at 1140. For example, a

12   purpose to harm might be found where an officer uses force to "get even" with a suspect or

13   "teach him a lesson." *Porter*, 546 F.3d at 1140.

14        Plaintiffs argue deliberation was practical because Mercer acted with deliberate

15   indifference. (Dkt. No. 34 at 23.) Defendants contend Mercer's actions are entitled to qualified

16   immunity under either standard because he did not act with deliberate indifference nor a purpose

17   to harm Flores unrelated to a legitimate law enforcement objective. (Dkt. Nos. 36 at 9; 31 at 17.)

18        Deliberation is practical where officials have ample time to correct their obviously

19   wrongful conduct, such as in Eighth Amendment prisoner-treatment or wrongful detention cases.

20   *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022) (citing *Porter*, 546 F.3d at 1139). There is

21   no time to deliberate, however, when officials are required to make 'repeated split-second

22   decisions' about how best to respond to a risk, "such as during a high-speed car chase or when

23   confronting a threatening, armed suspect." *Peck*, 51 F.4th at 893 (citing *Porter*, 546 F.3d at

24

1   1139). Although, logically, an officer might have time to engage in some form of deliberation,

2   "deliberation" is not so literal a concept.  *Id.*

3          Deliberation was not practical here.  Mercer arrived at the scene to find Flores advancing

4   toward two people with what appeared to be a knife in his hand.  (Dkt. No. 32 at 14.)  Flores then

5   began marching toward Mercer while swinging his arms and ignoring Mercer's multiple requests

6   to drop the knife.  (Dkt. No.  35-1 at 24.)  When he was 15 feet away from Mercer, Flores pulled

7   the knife back to lunge at the officer, saying, "Just do it. Just do it."  (*Id.* at 26–27.)  Although

8   there is no evidence indicating the length of the confrontation, Mercer certainly encountered "a

9   threatening, armed suspect" requiring quick decision-making.  *Peck*, 51 F.4th at 893 (citing

10  *Porter*, 546 F.3d at 1139).

11         Alcantar argues Mercer deliberately escalated the situation by screaming at him and

12  employing a lethal weapon.  (Dkt. No. 34 at 23.)  She argues Mercer knew Flores was

13  experiencing a mental health crisis based on their previous interactions but was deliberately

14  indifferent to the situation in exercising lethal force.  (*Id.*)  But Officer Mercer's alleged

15  indifference is of no consequence given the circumstances that confronted him.  This is because

16  deliberation was not practical.  Mercer, therefore, is entitled to qualified immunity against

17  Alcantar's Fourteenth Amendment claim unless he acted with a purpose to harm Flores unrelated

18  to a legitimate law enforcement objective.

19         In *Peck*, the Ninth Circuit rejected the argument that deputies made flawed tactical

20  choices early in an encounter, thereby creating a more lethal environment.  *Peck*, 51 F.4th at 894.

21  "[T]he purpose-to-harm standard can apply even where 'the officer may have helped to create an

22  emergency situation by his own excessive actions.'"  *Id.* (quoting *Porter*, 546 F.3d at 1132).

23  Even where the officers "could have potentially avoided the incident by obtaining more

24

1    information about [the suspect] or requesting a psychiatric emergency response team[,]" the

2    purpose-to-harm standard can still apply.  *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1230 (9th

3    Cir. 2013).

4           Here, the Court is unable to conclude Mercer acted with a purpose to harm.  Mercer shot

5    Flores to prevent him from harming officers or bystanders after Flores ignored multiple warnings

6    to put the knife down and stop advancing.  Preventing an armed suspect from committing acts of

7    violence is a legitimate law enforcement objective, and Mercer shot Flores to effectuate that

8    objective.  *See, e.g., Wilkinson*, 610 F.3d at 551 (finding officer did not act with purpose to harm

9    in firing shots at minivan ignoring police commands and attempting to accelerate within close

10   quarters of two officers on foot); *Peck*, 51 F.4th at 894 (finding officer did not act with purpose

11   to harm in opening fire on man ignoring warnings, picking up a gun and raising it toward

12   officers).

13          Therefore, Mercer is entitled to qualified immunity against Alcantar's Fourteenth

14   Amendment claim, and summary judgment in favor of Mercer is appropriate.

15         **D.  Fourth Amendment claim against Officers Mercer, Miller, and Ramirez**

16          Defendants assert the individually named officers are entitled to qualified immunity as to

17   Plaintiffs' Fourth Amendment claims against them.  (Dkt. No. 31 at 9.)  Defendants point out

18   neither Miller nor Ramirez used force on Flores.  (*Id.* at 18.)  Plaintiffs do not address this

19   argument, rather asserting genuine disputes exist regarding the officers' credibility.  (Dkt. No. 34

20   at 16.)  Failure to respond to Defendants' argument in this regard constitutes waiver.  *See Jenkins

21   v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) ("Jenkins abandoned her other two

22   claims by not raising them in opposition to the County's motion for summary judgment.");

23   *Ramirez v. Ghilotti Bros. Inc.*, 941 F.Supp.2d 1197, 1210 (N.D. Cal. 2013) (deeming argument

24

1   was conceded where the defendant failed to address it in its opposition); *Armstrong v. Cnty. of*

2   *Kitsap*, Case No. C04-5461 RBL, 2006 WL 3192518, at *5 (W.D. Wash., Nov. 2, 2009)

3   ("Failure of a party to address a claim in an opposition to a motion for summary judgment may

4   constitute a waiver of that claim.").  Based on the undisputed facts, neither Ramirez nor Miller

5   used force against Flores, and Plaintiffs' Fourth Amendment claim against them can therefore be

6   disposed as a matter of law in Defendants' favor.

7        Whether Mercer is entitled to qualified immunity for using lethal force against Flores is a

8   different question.  Defendants in a § 1983 action are entitled to qualified immunity from

9   liability for civil damages if their conduct does not violate clearly established statutory or

10  constitutional rights of which a reasonable person would have known.  *Pearson v. Callahan*, 555

11  U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified

12  immunity balances two important interests: the need to hold public officials accountable when

13  they exercise power irresponsibly and the need to shield officials from harassment, distraction,

14  and liability when they perform their duties reasonably.  *Pearson*, 555 U.S. 223, 231 (2009).

15  The existence of qualified immunity generally turns on the objective reasonableness of the

16  actions, without regard to the knowledge or subjective intent of the particular official.  *Harlow v.*

17  *Fitzgerald*, 457 U.S. at 819.  Whether a reasonable officer could have believed his or her conduct

18  was proper is a question of law for the court and should be determined at the earliest possible

19  point in the litigation.  *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993).

20       In analyzing a qualified immunity defense, the Court must determine: (1) whether a

21  constitutional right would have been violated on the facts alleged, taken in the light most

22  favorable to the party asserting the injury; and (2) whether the right was clearly established when

23  viewed in the specific context of the case.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "The

24

1    relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct

2    was unlawful in the situation he confronted." *Id*. at 194–195.  While the sequence set forth in

3    *Saucier* is often appropriate, it should no longer be regarded as mandatory.  *Pearson*, 555 U.S. at

4    236.  "The judges of the district courts and the courts of appeals should be permitted to exercise

5    their sound discretion in deciding which of the two prongs of the qualified immunity analysis

6    should be addressed first in light of the circumstances in the particular case at hand."  *Id*.

7                    1.   Violation of a constitutional right

8            The first step of a qualified immunity analysis is whether Mercer's actions created a

9    constitutional violation.  Plaintiffs' claimed violation of § 1983 for use of excessive force is

10   rooted in the Fourth Amendment's protection against unreasonable searches and seizures.

11   *Graham*, 490 U.S. at 394.  The "reasonableness" of a particular use of force must be judged from

12   the perspective of a reasonable officer on the scene rather than with the 20/20 vision of

13   hindsight.  *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).  "'Not every push or shove, even

14   if it may later seem unnecessary in the peace of a judge's chambers' . . . violates the Fourth

15   Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.

16   1973)).  "The calculus of reasonableness must embody allowance for the fact that police officers

17   are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

18   rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*,

19   490 U.S. at 396–397.

20           The "reasonableness" test is an objective one: "the question is whether the officers'

21   actions are 'objectively reasonable' in light of the facts and circumstances confronting them,

22   without regard to their underlying intention or motivation."  *Id*. at 397.  Those circumstances

23   include the severity of the crime at issue, whether the suspect posed an immediate threat to the

24

1   safety of the officers or others, and whether the suspect was actively resisting arrest or

2   attempting to evade arrest by flight. *Id.* at 396.

3        Deadly force is the most intrusive seizure a government official can effectuate. *See*

4   *Tennessee v. Garner*, 471 U.S. 1, 9 (1985) ("The intrusiveness of a seizure by means of deadly

5   force is unmatched."). Because no party disputes Mercer used the highest level of force against

6   Flores, the issue is whether the governmental interests at stake were sufficient to justify it. *Vos v.*

7   *City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018).

8        First, officers were responding to the report of a serious crime—attempted burglary—

9   involving multiple houses and the potential use of one or more weapons. Flores broke a window

10  and threatened to kill the occupants in one home. (Dkt. No. 32 at 19.) At the second house, he

11  beat the garage door while holding what appeared to be a shovel. (*Id.* at 28.) Police responded

12  to 911 calls reporting the break-ins. (*Id.* at 5); *see Vos*, 892 F.3d at 1031 (observing officers

13  were not responding to the report of a crime but rather a report of "erratic behavior"). The nature

14  of the ongoing criminal activity was violent and confrontational to officers and bystanders.

15  *Glenn v. Wash. Cty.*, 673 F.3d 864, 874 (9th Cir. 2011) (explaining the "character of the offense"

16  is an "important consideration"). This factor weighs in favor of the governmental interest

17  justifying lethal force.

18        Second, while Flores was not necessarily attempting to evade arrest by flight, he resisted

19  arrest to some degree by failing to comply with Mercer's orders to get on the ground and drop

20  the knife. This factor weighs slightly in favor of the government. *See A.K.H. ex rel. Landeros*,

21  837 F.3d 1005 at 1012 (9th Cir. 2016) (finding the "actively resisting" factor weighed only

22  slightly in favor of the government where the suspect did not heed the officer's commands to

23

24

1    "get down," but never attempted to cross the road and flee, moved the same speed as the officer,

2    and faced the officer much of the time).

3           Finally, the most important factor is whether Flores posed an immediate threat to the

4    safety of officers or others.  *Vos*, 892 F.3d at 1031–1032; *Longoria v. Pinal Cnty.*, 873 F.3d 699,

5    705 (9th Cir. 2017).  At one point, Flores was advancing toward two people in the crowd with a

6    knife.  (Dkt. No. 32 at 14.)  But, upon command from Mercer, Flores turned his attention to the

7    officers rather than bystanders.  (*Id.* at 15.)  Although he was approaching Mercer with the knife,

8    he was within 15 feet of Mercer when he was shot, a distance within the range of a less lethal

9    weapon, such as a Taser, which was available to Mercer.  (Dkt. No. 31 at 55); *see Vos*, 892 F.3d

10   at 1033 ("Vos was within 20 feet of the officers when he was shot, a distance within the range

11   of . . . a taser, or a canine.").  Additionally, Flores had not actually harmed anyone, but did

12   threaten others with the knife.  *See id.* (finding jury could reasonably conclude suspect did not

13   pose an immediate threat despite cutting a store clerk's hand with scissors); *Glenn*, 673 F.3d at

14   873 (finding suspect holding a knife was not an immediate threat as he "was not threatening

15   anyone with the knife[.]").  At best, there is a genuine dispute as to whether Flores posed an

16   immediate threat to the officers or others, weighing in neither Defendants nor Plaintiffs' favor.

17          However, the Ninth Circuit has made clear that the *Graham* factors are not exclusive.

18   *Vos*, 892 F.3d at 1033.  "Other relevant factors include the availability of less intrusive force,

19   whether proper warnings were given, and whether it should have been apparent to the officers

20   that the subject of the force used was mentally disturbed."  *Id.* at 1033–1034; *Bryan v.*

21   *McPherson*, 630 F.3d 805, 831 (9th Cir. 2010).

22          It is undisputed Mercer had available to him means of less intrusive force, including a

23   rifle, baton, pepper spray, and a Taser.  (Dkt. No. 35-1 at 19.)  No party disputes Mercer gave

24

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 31) - 14

proper warnings, telling Mr. Flores to drop the knife "multiple times." (Dkt. No. 35-1 at 24.) And like in *Vos*, "it is undisputed that [Mr. Flores] was mentally unstable, acting out, and at times invited officers to use deadly force on him. These indications of mental illness create a genuine issue of material fact about whether the government's interest in using deadly force was diminished." *Vos*, 892 F.3d at 1034.

Plaintiffs argue Mercer either recognized or should have recognized Flores from prior contacts in which he clearly demonstrated mental instability. (Dkt. No. 34 at 16.) But even an officer who had never encountered Flores before would identify erratic behavior suggesting he was mentally disturbed. Flores did not run or walk, but rather marched with his chest forward, swinging his arms and "looking at [Mercer] but right through" him with a "thousand-yard stare." (Dkt. No. 35-1 at 22, 24.) After ignoring repeated warnings from Mercer, Flores stated "Just do it. Just do it. Just do it." (*Id.* at 26.) When asked what he interpreted those words to mean, Mercer stated, "I thought possibly he just wanted—it was a suicide by cop type of scenario." (*Id.* at 28.)

Balancing these considerations, a reasonable jury could find that the force employed was greater than is reasonable under the circumstances. *See Vos*, 892 F.3d at 1034. Flores's behavior creates a genuine issue of material fact about whether the government's interest in using deadly force was diminished. Summary adjudication of whether Mercer violated Flores's Fourth Amendment right on these grounds is therefore inappropriate.

### 2. Whether the right was "clearly established"

The inquiry does not end there, however. Even if Mercer violated a constitutional right, he is still protected from liability for civil damages unless the constitutional right was clearly

1  established at the time of his alleged misconduct.  *Pearson*, 555 U.S. at 232; *C.V. ex rel. Villegas*

2  *v. City of Anaheim*, 823 F.3d 1252, 1257 (9th Cir. 2016).

3          "A clearly established right is one that is 'sufficiently clear that every reasonable official

4  would have understood that what he is doing violates that right.'"  *Mullenix v. Luna*, 577 U.S. 7,

5  11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Courts may grant qualified

6  immunity on the ground that a purported right was not clearly established by prior case law.

7  *Reichle*, 566 U.S. at 664.

8          Plaintiffs must "identify a case where an officer acting under similar circumstances" was

9  held to have violated the Fourth Amendment.  *White v. Pauly*, 580 U.S. 73, 79 (2017).  In

10  determining whether the right has been clearly established, there does not need to be "a case

11  directly on point, but existing precedent must have placed the statutory or constitutional question

12  beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

13          Plaintiffs identify three cases to show Mercer violated a clearly established right.  (Dkt.

14  No. 34 at 20–21).  Plaintiffs state: "it is undisputed that officers cannot shoot an unarmed non-

15  dangerous suspect in the 'absence of probable cause to believe that the suspect poses a threat of

16  serious harm . . . .'" (*Id.*) (quoting *S.R. Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019)).

17  Notably, *Nehad* was decided on July 11, 2019—two months after Flores's death.  *Nehad* could

18  not have given fair notice to Mercer, then, "because a reasonable officer is not required to

19  foresee judicial decisions that do not yet exist . . . ." *Kisela v. Hughes*, 138 S. Ct. 1148, 1154

20  (2018).  To the extent *Nehad* references a long-standing principle, the facts here differentiate it.

21  While it is true under *Torres* and *Garner* that officers cannot shoot an unarmed non-dangerous

22  suspect, Mercer encountered an armed suspect.  *See Nehad*, 929 F.3d at 1141 (citing *Torres*, 648

23  F.3d at 1128; *Garner*, 471 U.S. at 11).

24

1    Plaintiffs next cite *Estate of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017),

2  in which police officers shot and killed a teenager walking down the street when they mistakenly

3  believed the toy gun he carried was an AK-47.  The officer in *Lopez* was denied qualified

4  immunity because he was on fair notice that the use of deadly force is unreasonable where the

5  victim does not directly threaten the officer with the gun.  *Lopez*, 871 F.3d at 1020.  *Lopez*

6  presented sufficiently distinguishable circumstances than those faced by Mercer.  The victim in

7  *Lopez* was "walking normally and appear[ed] composed and non-threatening immediately prior

8  to turning" around to face the officers, potentially in an effort to comply, when he was

9  immediately shot.  *Lopez*, 871 F.3d at 1020.  By contrast, Flores had attempted to break into two

10  homes and had approached both bystanders and officers with a knife while ignoring instructions

11  from Mercer.  The officers in *Lopez* did not act in similar enough circumstances to those faced

12  by Mercer here to constitute fair notice placing the constitutional question "beyond debate."

13  *Ashcroft*, 563 U.S. at 741.

14    Plaintiffs also point to *George v. Morris*, 736 F.3d 829 (9th Cir. 2013).  The victim in

15  *George* suffered from a terminal case of brain cancer, and, in the middle of the night, retrieved a

16  pistol from his truck and loaded it with ammunition, leading his wife to call 911.  *George*, 736

17  F.3d at 832.  When deputies arrived, they encountered the 64-year-old man using his walker and

18  holding his pistol pointed downward.  *Id.* at 833, 839.  Twelve seconds after the deputies

19  broadcast the man had a firearm, they fatally shot him.  *Id.* at 833.  The court denied qualified

20  immunity because it was clearly established law enforcement officials may not kill suspects who

21  do not pose an immediate threat to their safety or to the safety of others simply because they are

22  armed.  *Id.* at 838 (citing *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997)).

23

24

1       Again, unlike the decedent in *George*, Flores was not merely standing on his own

2   property with a weapon pointed downward; he was brandishing a knife at bystanders and began

3   lunging toward Mercer with the knife at the time he was shot.  While in *George* it was

4   "undisputed that Mr. George had not committed a crime, and that he was not actively resisting

5   arrest[,]" Flores had attempted to break into two homes prior to ignoring warnings from Mercer

6   to halt and get on the ground.  *Id.* at 838.  *George* does not put Mercer on notice that his actions

7   in this case constituted a Fourth Amendment violation.

8       Plaintiffs identify no other case on point giving notice to Mercer that his actions violated

9   a clearly established constitutional right.  It is the plaintiff who bears the burden of showing the

10  rights allegedly violated were clearly established.  *Shafer v. Cnty. of Santa Barbara*, 868 F.3d

11  1110, 1118 (9th Cir. 2017).  Accordingly, Mercer is entitled to qualified immunity on Plaintiffs'

12  Fourth Amendment claim against him, and summary judgment in his favor is granted.

13      **E.  *Monell* Claim**

14      Plaintiffs also contend the City of Centralia is liable under *Monell v. New York City Dep't*

15  *of Soc. Serv.*, 436 U.S. 658 (2018).  Under *Monell*, a local government may be sued only where

16  "execution of a government's policy or custom . . . inflicts the injury that the government as an

17  entity is responsible under § 1983."  *Monell*, 436 U.S. at 694.  If there is no constitutional

18  violation, there can be no municipal liability under *Monell*.  *Villegas*, 541 F.3d at 957.

19      However, where qualified immunity determinations rest solely on the "clearly

20  established" prong, *Monell* liability may still lie if such a constitutional violation occurred.

21  *Horton ex rel. Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019) (citing *Gibson v.*

22  *Cnty. of Washoe*, 290 F.3d 1175, 1186 n.7 (9th Cir. 2002) ("[A] municipality may be liable if an

23

24

1  individual officer is exonerated on the basis of the defense of qualified immunity, because even

2  if an officer is entitled to immunity a constitutional violation might still have occurred.").

3  To establish liability for governmental entities under *Monell*, a plaintiff must prove

4  (1) the plaintiff possessed a constitutional right of which he was deprived; (2) the municipality

5  had a policy; (3) the policy amounts to deliberate indifference to the plaintiff's constitutional

6  right; and (4) the policy is the moving force behind the constitutional violation.  *Dougherty v.*

7  *City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citing *Plumeau v. Sch. Dist. No. 40 Cnty. of*

8  *Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

9  Plaintiffs do not identify a particular policy in their response.  (*See* Dkt. No. 34.)  Rather,

10  they argue the City of Centralia's decision not to properly train officers how to intervene during

11  mental health crises rose to the level of an official government policy for purposes of § 1983.

12  (Dkt. No. 34 at 24) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

13  It is true in limited circumstances a local government's decision not to train certain

14  employees about their legal duty to avoid violating citizens' rights may rise to the level of an

15  official government policy.  *Connick*, 563 U.S. at 61.  A municipality's culpability for a

16  deprivation of rights is at its most tenuous where a claim turns on a failure to train.  *Id.*  Such a

17  failure must be the result of deliberate indifference, "a stringent standard of fault," wherein "city

18  policymakers are on actual or constructive notice that a particular omission in their training

19  program causes city employees to violate citizens' constitutional rights" and "choose to retain

20  that program."  *Id.*

21  While Plaintiffs concede the City offered training addressing how officers should handle

22  persons experiencing mental health crises, they argue the officers deposed could not recall the

23  details of their trainings, did not have tools to deal with someone experiencing a crisis, and failed

24

to deescalate the situation or use non-lethal weapons available to them.  (Dkt. No. 34 at 25.) None of these rises to the level of deliberate indifference.  Plaintiffs present no detail of how and why any training program caused officers to violate citizen's constitutional rights, much less demonstrate city policymakers are aware of this fact and have chosen to continue such a program.  Without some conscious or deliberate choice of the City, Plaintiffs' *Monell* claim fails as a matter of law.

### F.  State Law Claims

Plaintiffs' remaining claims are assault and battery, wrongful death, and negligence against Defendants under Washington state law.  (*See* Dkt. No. 13 at 9.)  A district court may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c)(3).  Because summary judgment is granted as to all of Plaintiffs' federal claims, this Court declines to exercise jurisdiction over the remaining claims under Washington state law.

### IV    CONCLUSION

Accordingly, and having considered Defendants' motion, the briefing of the parties, and the remainder of the record, the Court finds and **ORDERS** that City of Centralia, Washington, and Officers Frederick J. Mercer, Aaron M. Miller, and Ruben Z. Ramirez's Motion for Summary Judgment is **GRANTED.**

> 1.  As to the claimed Fourteenth Amendment violation by the City of Centralia, Summary Judgment is **GRANTED.**
>
> 2.  As to the claimed Fourth Amendment violation by the City of Centralia, Summary Judgment is **GRANTED.**

3.  As to the claimed Fourth Amendment violation by Officer Frederick Mercer, Officer Aaron Miller, and Officer Ruben Ramirez, Summary Judgment is **GRANTED.**

4.  As to the claimed Fourteenth Amendment violation by Officer Frederick Mercer, Summary Judgment is **GRANTED.**

5.  As to the State assault and battery claims against all Defendants, the Court **DECLINES** to exercise supplemental jurisdiction per 28 U.S.C. § 1367(c)(3).

6.  As to the State negligence claims against all Defendants, the Court **DECLINES** to exercise supplemental jurisdiction per 28 U.S.C. § 1367(c)(3).

7.  Defendants' Motion to Continue Trial Date (Dkt. No. 38) is **DENIED** as moot.

8.  The Clerk is **DIRECTED** to close this case.

DATED this 2nd day of October 2023.

David G. Estudillo
United States District Judge

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 31) - 21